IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

SEBASTIAN K. KOTHMANN,
        Plaintiff,

vs.                                            Case No. 3:16cv194/MCR/EMT

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,
        Defendant.
_____/

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq*. It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, and for Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.    PROCEDURAL HISTORY

On April 29, 2011, Plaintiff filed applications for DIB and SSI, and in both applications he alleged disability beginning January 10, 2007 (Tr. 21).[1]   His applications were denied initially on September 1, 2011, and on reconsideration on February 22, 2012, after which Plaintiff requested a hearing before an administrative law judge ("ALJ").   An initial hearing was held on August 14, 2013, and a supplemental video hearing was held on March 3, 2014.  On August 29, 2014, the ALJ issued a partially favorable decision in which he found Plaintiff not disabled as defined under the Act at any time through December 31, 2012, his last date of insured status for DIB benefits (Tr. 36).  The ALJ did find Plaintiff disabled as of January 28, 2013, and granted his application for SSI benefits as of that date (Tr. 36).  On April 15, 2016, the Appeals Council denied Plaintiff's request for review (Tr. 9).  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to

---

[1] All references to "Tr." refer to the transcript of Social Security Administration record filed on September 7, 2016 (ECF No. 11).  The page numbers refer to those found on the upper right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system.

review in this court.  Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262

(11th Cir. 2007).

II.    FINDINGS OF THE ALJ

On August 29, 2014 (date of ALJ decision), the ALJ made several findings

relative to the issues raised in this appeal (tr. 21–36):

1)    Plaintiff met the insured status requirements of the Act through December 31, 2012;

2)    Plaintiff had not engaged in substantial gainful activity since the alleged onset date;

3)    Since the alleged onset date of disability, January 10, 2007, Plaintiff had the following severe impairments: gender identity dysphoria; opiate dependency; opiate dependence; posttraumatic stress disorder ("PTSD"); an anxiety disorder, not otherwise specified; cervical lymphadenitis; degenerative disc disease of the cervical spine; facet joint hypertrophy of the cervical spine; and back pain of uncertain etiology.  Beginning on the established onset date of disability, January 28, 2013, Plaintiff had the following severe impairments: coronary artery disease, status post myocardial infarction and stent placement; gender identity dysphoria; opiate dependency; opiate dependence; PTSD; an anxiety disorder, not otherwise specified; cervical lymphadenitis; degenerative disc disease of the cervical spine; facet joint hyperthrophy of the cervical spine; and back pain of uncertain etiology;

4)    Since the alleged onset date of disability, January 10, 2007, Plaintiff had not had an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;

5) Prior to January 28, 2013, the date Plaintiff became disabled, Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). Plaintiff was able to lift and/or carry up to 20 pounds occasionally and up to 10 pounds frequently, stand and/or walk for up to six hours in an eight-hour workday, and sit for up to six hours in an eight-hour workday. However, Plaintiff required the option to alternate sitting and standing every 30 minutes. Plaintiff was occasionally able to push and/or pull with both upper extremities. Plaintiff was able to frequently push and/or pull with both lower extremities. Plaintiff was able to balance, stoop, kneel, and crouch frequently. Plaintiff was able to crawl and climb ramps and stairs occasionally. Plaintiff was unable to climb ladders, ropes, or scaffolds. Plaintiff was able to reach overhead occasionally, bilaterally. Plaintiff was able to reach in other directions frequently, bilaterally. Plaintiff was able to handle, finger and feel frequently, bilaterally. Plaintiff was able to have occasional exposure to vibration. Plaintiff needed to avoid all exposure to unprotected heights and dangerous machinery. Plaintiff was able to perform simple, routine tasks involving no more than simple, short instructions and simple work-related decisions with few workplace changes. Plaintiff was able to sustain concentration and attention for two-hour periods with customary breaks.

6) Beginning on January 28, 2013, Plaintiff had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except Plaintiff was able to lift up to 10 pounds occasionally, but items of negligible weight frequently. Plaintiff was able to stand for up to two hours in an eight-hour workday and for no more than 30 minutes at a time. Plaintiff was able to sit for six hours in an eight-hour workday and for no more than one hour at a time. Plaintiff was able to push and/or pull with his upper extremities occasionally, bilaterally. Plaintiff was able to push and/or pull with his lower extremities occasionally, bilaterally. Plaintiff was able to balance, stoop, kneel, crouch, crawl, and climb ramps and stairs occasionally. Plaintiff was unable to climb ladders, ropes, or scaffolds. Plaintiff was able to perform no overhead reaching, bilaterally. Plaintiff was able to reach in other directions occasionally, bilaterally. Plaintiff was able to

handle, finger, and feel frequently, bilaterally. Plaintiff was able to have occasional exposure to extreme cold, extreme heat, and vibration. Plaintiff was required to avoid all exposure to pulmonary irritants, unprotected heights, and dangerous machinery. Plaintiff was able to perform simple, routine tasks involving no more than simple, short instructions and simple work-related decisions with few workplace changes. Plaintiff was able to have no transactional interaction with the public. Plaintiff was able to sustain concentration and attention for two-hour periods with customary breaks.

7) Since January 10, 2007, Plaintiff has been unable to perform any past relevant work;

8) Prior to the established disability onset date, Plaintiff was a younger individual aged 18–49. Plaintiff's age category had not changed since the established disability onset date;

9) Plaintiff had at least a high school education and was able to communicate in English;

10) Prior to January 28, 2013, transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that Plaintiff was "not disabled" whether or not he had transferable job skills. Beginning on January 28, 2013, Plaintiff had not been able to transfer job skills to other occupations;

11) Prior to January 28, 2013, considering Plaintiff's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed;

12) Beginning on January 28, 2013, considering Plaintiff's age, education, work experience, and residual functional capacity, there were no jobs that existed in significant numbers in the national economy that Plaintiff could have performed;

13) Plaintiff was not disabled prior to January 28, 2013, but became disabled on that date and continued to be disabled through the date of the decision; and

14) Plaintiff was not under a disability within the meaning of the Act at any time through December 31, 2012, the date last insured.

## III. STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); see also Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), superseded by statute on other grounds as stated in Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote

v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g),[2] the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, he is not disabled.

2.      If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that

---

[2] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416).  Therefore, hereinafter, citations in this Report should be considered to refer to the appropriate parallel provision.  The same applies to citations of statutes or regulations found in quoted court decisions.

accommodates his residual functional capacity and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV. PLAINTIFF'S PERSONAL AND MEDICAL HISTORY

### A. Personal History

During his August 14, 2013, hearing, Plaintiff testified that, due to significant pain issues with his arms and neck, and a reluctance from his doctors on account of his age to prescribe stronger painkillers, Plaintiff committed prescription fraud for which he was convicted in 2010 and placed in a six-month rehabilitation program, which he completed (Tr. 967–68). Plaintiff explained that, due to five herniated discs in his neck, he suffers neck pain and that causes his arms to frequently go numb, tingle, and have shooting pain (Tr. 970). He stated that he has a limited range of

motion in his neck particularly while moving to the right and that he constantly needs to shift positions or move his shoulders (*id.*). Plaintiff stated that he could sit for approximately 15 to 20 minutes before he would feel numbness and a need to change positions or stand, and that he could stand only for about 15 minutes before the pain became uncontrollable (Tr. 971). Plaintiff further stated that when walking he experiences extreme shortness of breath, which he traces to his "heart attack" in January 2013 (Tr. 971–72).

Plaintiff testified that he could not lift more than about 5 pounds without causing pain and that "Dr. Lee" advised him not to lift anything heavier than a telephone book (Tr. 972). Plaintiff also stated that lifting his arms above his head was "really not an option" and that pushing or pulling affected his neck considerably (Tr. 972–73). Plaintiff further stated:

> And I don't know if [Dr. Lee] has got me on such a weight [lifting] restriction solely because of the neck issue or because it's in combination with, you know, the post-cardiac care from the heart attack. He's also, I think, been treating me for COPD. So the issues kind of bleed together, and I have difficulty telling which issue is, you know, creating the problem.

(Tr. 973). Plaintiff stated that pain causes problems with his concentration, raises his anxiety, and increases his blood pressure (*id.*). Plaintiff stated that the painkillers make his pain manageable, but, in combination with his muscle relaxer and anxiety

medication, it makes him drowsy (Tr. 973–74). When asked if the limitations he described at the hearing were any different in 2011 when he was released from prison, he responded that they were not (Tr. 974).

On an average day, Plaintiff stated that it takes him 2 hours to get up, shower, and get dressed because of pain and fatigue (Tr. 977–78). Plaintiff provided that he is able to grocery shop or go to his appointments but that he tries to plan only one such event per day due to fatigue (Tr. 978). Plaintiff testified that he needs to lie down and rest 3 to 4 times per day for 40 minutes to 2 hours each time (Tr. 979).

B.    Relevant Medical History

Plaintiff last held a job in January of 2010, but his last substantial gainful activity was in 2007, before he underwent surgery for Gender Identity Dysphoria ("GID").[3] Plaintiff has a history of back pain and was assessed as having facet

---

[3] Plaintiff was born a human chimera, a person composed of two genetically distinct type of cells. Plaintiff has two sets of DNA in his body, one female and the other male. Although technically born a female with female genitalia and female reproductive organs, Plaintiff was born with only an 8% female genetic makeup. The other 92% of his DNA is male. While chimera syndrome is not itself disabling, Plaintiff suffers from GID due to this syndrome (Tr. 517–19). Plaintiff identified as a male since the age of five, and in 2005 he began the transition into becoming fully male. From 2005 to 2007, Plaintiff has had a hysterectomy, received hormone treatments, and undergone a double mastectomy (Tr. 318–30, 517–19). Further, Plaintiff was also sexually abused as a child, which has caused him to suffer from PTSD and anxiety due to the GID (Tr. 332–35, 385–89, 508–28, 919–20, 925–29, 945–50). Plaintiff has undergone significant psychological treatment for his GID, and while his anxiety and other mental health symptoms can be seen as an outgrowth of his GID, his GID is largely seen as adequately managed under the circumstances. As a result, Plaintiff does not directly challenge the ALJ's findings on the basis of his GID or other mental health concerns, but rather Plaintiff primarily focuses on his physical problems with his neck, arms, and cervical spine. Accordingly, this Report focuses on these physical issues as well.

arthropathy of the cervical spine, cervicalgia, and radicular symptoms of the upper limbs (Tr. 24, 707, 744). During part of these previous years, from April of 2010 to April of 2011, Plaintiff was incarcerated in the Florida Department of Corrections ("FDOC"), during which time he received some treatment for back pain and neck pain but, as noted during an April 27, 2010, examination, he had normal strength and range of motion (Tr. 744). After his release in June of 2011, Plaintiff was seen by Ronald A. Maddox, M.D., complaining of episodic neck pain and stiffness that had been occurring for a couple of years and exacerbated by the use of heavy equipment (Tr. 423–28). Plaintiff was referred for x-rays, which revealed mild cervical spondylosis with reversal of the lordotic curvature and multilevel uncinated spurring (Tr. 422).

On July 19, 2011, Plaintiff was seen by Michael J. Rinaldi, D.O., an Ear Nose and Throat specialist, for his lymphadenopathy; because of Plaintiff's cervical radiculopathy, the symptoms of which were reported to have been occurring for several months Dr. Rinaldi ordered an MRI of Plaintiff's cervical spine (Tr. 395–96). As recapitulated by the ALJ in his opinion:

> Magnetic resonance imaging (MRI) of the claimant's cervical spine, performed on August 18, 2011, showed slight disc space narrowing and posterior disc bulges, slightly more pronounced at C5-C6, resulting in extradural impression upon the thecal sac and resulting in touching the cord slightly eccentric toward the right, at C2-C3, C3-C4, and C4-C5, a

minimal posterior disc bulge slightly eccentric with preservation of a thin layer of subarachnoid space anterior to the cord at C6-C7, a posterior disc bulge of approximately two millimeters appearing to narrow the subarachnoid space resulting in minimal touching of the cord at C4-C5, and slight spurring from the luschka joints with minimal hypertrophic changes at the facet joint complexes, resulting in mild encroachment upon the inferior aspect of the right intervertebral neural foramina, at C3-C4

(Tr. 24; *see also* 441–42).

Dr. Rinaldi also reviewed a CT scan of the neck area which confirmed diffuse cervical adenopathy, for which he scheduled an excisional biopsy of a mass in the neck (Tr. 400). Dr. Rinaldi's treatment plan incorporated scheduling Plaintiff with a neurologist/orthopedic specialist (Tr. 398–99). On October 5, 2011, Dr. Rinaldi surgically excised the mass in Plaintiff's neck, without complication (Tr. 401–07).

On September 28, 2011, Rodger Garrett, M.D., a pain management specialist, evaluated Plaintiff upon referral from Dr. Maddox. Plaintiff presented with neck pain on both sides that had begun two years prior and was continuous (Tr. 435). The pain affected Plaintiff's ability to concentrate, was worsened by sitting and lying down, but was relieved by walking (*id.*). Plaintiff also reported sleep disturbances, tingling sensations, and weakness and numbness in his arms (*id.*). Dr. Garrett stated that conservative treatment modalities including medication management, injection

therapy, physical therapy, and stimulation therapy would be medically necessary to improve Plaintiff's functionality and quality-of-life (*id.*).

On July 25, 2011, Plaintiff was psychologically evaluated by Susan Danahy, Ph.D., at the request of the Office of Disability Determinations. Dr. Danahy diagnosed Plaintiff with Gender Identity Disorder, opiate dependence claimed to be in sustained remission, provisional PTSD, anxiety disorder, and depressive disorder (Tr. 388). Dr. Danahy scored Plaintiff's Global Assessment of Functioning at 50 (Tr. 389).

Plaintiff began treatment with John M. Lee, M.D., in October 2011, initially seeing him for a gynecological examination but then as a primary care physician (Tr. 516–17). Plaintiff reported that other than his cervical neck problems and lymph node issues in his neck, "things have been fairly benign" (Tr. 517). Dr. Lee diagnosed Plaintiff as suffering from chronic neck pain with upper limb radiculopathy, episodic pain, chronic neck and back muscle spasms, lymphadenopathy, hypertension, and anxiety secondary to transgender conflict (Tr. 515, 518, 523). Dr. Lee began treating Plaintiff's neck condition conservatively with medication, including narcotic pain medications (Tr. 508–15).

On February 15, 2012, Dr. Lee evaluated Plaintiff's physical capabilities, stating that he should avoid lifting over 10 pounds and avoid any activity requiring

repetitive motion of his upper limbs or neck (Tr. 515). On May 24, 2012, Dr. Lee again evaluated Plaintiff, stating that because of multiple medical issues, including a chronic rotator cuff injury, hypertension, and his then-current hormonal replacement therapy, Plaintiff required analgesic pain relief and medication for his anxiety, which would significantly restrict his mental capacity for reasonable functioning and productivity in a work environment (Tr. 518). Dr. Lee stated that Plaintiff "would have a significant time carrying on work place related duties, secondary to these physical and psychological problems" (*id.*).

On February 22, 2012, Rueben Brigety, M.D., performed a Disability Determination (Tr. 67–83). Dr. Brigety opined that Plaintiff had the capacity to occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, sit, stand or walk for 6 hours in an 8 hour day, and push or pull on an unlimited basis except for his limitations with lifting and carrying (Tr. 77). Dr. Brigety determined that Plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl (Tr. 77–78). Dr. Brigety thereby concluded that Plaintiff was capable of performing light work with the identified limitations (Tr. 82, 94, 99).

Plaintiff was admitted into Sacred Heart Hospital on January 28, 2013, presenting with ST-elevation myocardial infarction and acute coronary syndrome, for which he received an emergent coronary angiography and percutaneous coronary

intervention to the proximal left anterior descending artery using a bare metal stent (Tr. 471–507). Plaintiff was discharged on January 30, 2013, in stable condition (Tr. 471–74).

On February 8, 2013, Plaintiff was seen on a follow-up visit by Rohit Amin, M.D., of Sacred Heart Cardiology Pensacola, who noted that Plaintiff had been experiencing moderate fatigue with elevated blood pressure since the operation but no chest discomfort (Tr. 529–31). On February 22, 2013, Dr. Lee noted that Plaintiff was doing fairly well following the operation other than feeling fatigued (Tr. 528). On March 21, 2013, Plaintiff again saw Dr. Amin, reporting that his fatigue and dyspnea were markedly better since his last visit and that he had no pain (Tr. 532). On a March 22, 2013, visit with Dr. Lee, however, Plaintiff reported having issues with chest palpitations and feeling sudden shortness of breath and losing his breath (Tr. 527).

On May 23, 2013, Dr. Lee noted that Plaintiff had worsening neck pain, and he noted neck tenderness, greater on the right, with limited range of motion and marked paraspinal tenderness (Tr. 920). Dr. Lee suspected Plaintiff had a compressed disc and/or compressed nerve because of the upper limb radiculopathy and the pain and headaches (*id.*). He determined that Plaintiff would need an MRI of the neck if he did not get better (*id.*). At a June 21, 2013, visit, Dr. Lee did not specifically address

Plaintiff's neck issue, only generally noting his history of chronic neck and back pain (Tr. 919). Dr. Lee did note that Plaintiff had some element of COPD from his smoking history (*id*.).

Dr. Amin, after an examination of Plaintiff on July 23, 2013, noted that Plaintiff continued to experience exertional dyspnea and fatigue both at rest and with minimal activity, but that Plaintiff was clinically stable from a cardiovascular standpoint, and an echocardiogram performed that day showed full recovery of his left ventricle systolic dysfunction (Tr. 921–24).

On July 30, 2013, Dr. Lee completed a Clinical Assessment of Pain form for Plaintiff (Tr. 925–29). Dr. Lee indicated on the "multiple choice" form that Plaintiff's pain was significant enough to be distracting to the adequate performance of daily activities or work, that physical activity would increase his pain to such a degree as to cause distraction from tasks or total abandonment of a task, and that side effects from his prescribed medications could be expected to be severe and to limit his effectiveness due to distraction, inattention, and drowsiness (Tr. 925–26). On a Physical Capacities Evaluation form completed on the same day, Dr. Lee indicated that Plaintiff could not stand or walk for more than one hour at any one time or for more than two hours over the course of an 8-hour day, and that he could not sit for more than one hour at any one time or for more than one hour during an 8-hour day

(Tr. 927). Dr. Lee also indicated that Plaintiff could not use his hands repetitively for pushing, pulling, or fine manipulation, but that he could perform simple grasping and repetitive movements with his feet (Tr. 928). He further indicated that Plaintiff could only lift 10 pounds occasionally and 5 pounds frequently and that he would need to rest or lie down several times per day (*id*.). Dr. Lee opined that Plaintiff's allegations of pain were consistent with his clinical findings, and that the described limitations either had lasted or could be expected to last for 12 months or longer (Tr. 929). Dr. Lee indicated that this level of severity of the above symptoms and limitations existed as early as 2011 (Tr. 926, 929).

On August 19, 2013, Dr. Lee again saw Plaintiff for follow-up and renewal of his medications; he noted Plaintiff's chronic neck and back pain and fatigue (Tr. 947). At a November 15, 2013, appointment, Dr. Lee noted that Plaintiff was still in a lot of pain, plus secondary nausea (Tr. 945). At a February 10, 2014, appointment, Dr. Lee noted that Plaintiff was "[h]aving a tough time controlling his pain" (Tr. 949). Dr. Lee recommended that Plaintiff be put on a Butrans Patch, "hoping that the 24/7 coverage will help alleviate some of his neck and back pain and then he can use his Oxycodone, 30mg, one po, hopefully, q 12 hours versus q six hours, for breakthrough" (*id*.).

On September 28, 2013, Maria Rodriquez, M.D., performed a Florida Disability Determination Services consultation and assessment with Plaintiff (Tr. 932–44). Dr. Rodriguez opined that Plaintiff had mild limitation with regard to PTSD, hypertension, and his cervical spine, and moderate limitation with regard to his cardiovascular impairment and COPD (Tr. 936–37). Dr. Rodriguez indicated Plaintiff was limited to lifting or carrying no more than 10 pounds frequently (Tr. 938). She also opined that Plaintiff could sit at one time for one hour, stand for 45 minutes at a time, and walk for 30 minutes at a time, and could sit, stand, and walk a total of 8, 6, and 4 hours, respectively, during an 8 hour work day (Tr. 938–39). She noted that he should never reach overhead, could occasionally reach in other planes, and could frequently but not continuously climb ladders or scaffolds (Tr. 940–41).

V.    DISCUSSION

Plaintiff's first claim centers on the ALJ's finding that Plaintiff did not become disabled until January 28, 2013, and that prior to that date Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567 (b) and 416.967 (b) with additional limitations (Tr. 27). Because December 31, 2012, was the last date of insured status for Plaintiff as far as DIB benefits, the ALJ's decision had the effect of precluding those benefits. Plaintiff contends that the ALJ's finding was not supported by competent substantial evidence insofar as it improperly discounted the findings of

Dr. Lee as Plaintiff's treating physician. Plaintiff states that he should have been found disabled as early as October 12, 2011, the first day upon which he sought treatment from Dr. Lee.

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See* Lewis v. Callahan, 125 F.3d 1436, 1439–41 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(c). "'[G]ood cause exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See* Edwards, 937 F.2d 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

However, if a treating physician's opinion on the nature and severity of a claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial

evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(c)(2). This is because treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Id.*

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(d). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether Plaintiff meets a listed impairment, a claimant's RFC (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of

vocational factors, because those ultimate determinations are the province of the Commissioner. 20 C.F.R. § 404.1527(d).

In the instant case, the ALJ found Plaintiff capable of light work with limitations prior to January 28, 2013, but capable only of sedentary work with limitations, and therefore disabled, beginning on that date. In challenging the ALJ's determination regarding Plaintiff's prior (pre-2013) capability to perform light work, Plaintiff contends that the ALJ erred by overriding the findings of Dr. Lee relative to that time period.

The ALJ assigned little weight to the opinions provided by Dr. Lee on February 15 and May 24, 2012, which provided that Plaintiff should avoid lifting objects over 10 pounds and performing activities that would require repetitive motion of his upper limbs or neck, and that Plaintiff would have significant difficulties in being functional and productive at work (Tr. 29). The ALJ found Dr. Lee's assessments to be inconsistent with the other medical information in the file concerning that time period: namely, Plaintiff's physical examination in April 2010 by the State of Florida Department of Corrections which found normal range of motion in Plaintiff's upper extremities; and treatment notes from Dr. Rinaldi from July to September 2011 showing that Plaintiff did not have any focal weakness, loss of sensation, incoordination, or abnormal gait or station.

The ALJ likewise gave little weight to Dr. Lee's opinion rendered on July 30, 2013, that Plaintiff could sit for no more than one hour and stand or walk for no more than two hours during an eight-hour day. The court additionally points out that this 2013 opinion is relevant to the pre-2013 assessment only to the extent that Dr. Lee answered a "fill-in-the-blank" question to the effect that Plaintiff's limitations were at that level of severity as early as 2011 (Tr. 926, 929). Medical evaluations provided on preprinted forms offer less persuasive evidence of the validity or accuracy of the opinions expressed therein. *See, e.g.*, Spencer ex rel. Spencer v. Heckler, 765 F.2d 1090, 1094 (11th Cir. 1985); Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993). Moreover, medical evidence, even from a treating physician, which is provided after the relevant time period and therefore endeavors to describe a claimant's condition retrospectively, is entitled to little or no consideration unless it is corroborated by evidence that is contemporaneous with the previous time period. Mason v. Comm'r of Soc. Sec., 430 F. App'x 830, 832 (11th Cir. 2011); Hughes v. Comm'r of Soc. Sec. Admin., 486 F. App'x 11, 13–14 (11th Cir. 2012).

As the ALJ additionally found, Plaintiff's x-ray and MRI results showed only mild cervical spondylosis, slight disc space narrowing, and slight or minimal disc bulges, and that other diagnoses such as those from Dr. Garrett recommended a conservative course of treatment. The court additionally notes that medical

impressions from Dr. Maddox, M.D., also called for conservative treatment to improve Plaintiff's functionality. Plaintiff points out that the medical assessments above occurred during 2010–2011, before Dr. Lee began seeing Plaintiff, and he thereby argues that Plaintiff's condition may have worsened by the time Dr. Lee became involved. However, Dr. Lee's own medical notes at the time indicated that "things [had] been fairly benign" for Plaintiff (Tr. 517), and his own treatment plan for Plaintiff was a conservative one mainly involving medication.

Based on the above, the court finds that the ALJ sufficiently established an inconsistency between Dr. Lee's opinions and the other findings and evidence in the record sufficient to discount Dr. Lee's opinion regarding Plaintiff's work limitations prior to 2013. Plaintiff, however, asserts one final argument against the ALJ in this regard, questioning the fact that the ALJ assigned little weight to Dr. Lee's July 30, 2013, opinion regarding Plaintiff's pre-2013 RFC, yet assigned great weight to that same opinion as it concerned Plaintiff's post-2013 RFC. That is a fair question, but the answer is evident from the record. First, as previously stated, Dr. Lee's 2013 opinions regarding Plaintiff's physical limitations have a retrospective quality, rendering them subject to less deference. Second, and more importantly, the dividing line between the ALJ's two RFC assessments, January 28, 2013, is the date Plaintiff was admitted to the hospital for heart surgery. Indeed, much of the ALJ's description

of Plaintiff's limitations after this date reflect difficulties that can be traced to Plaintiff's cardiac problems, which caused exertional dyspnea and fatigue, as particularly noted by Dr. Amin just days before Dr. Lee wrote his opinion, but also as noted by Dr. Lee himself (Tr. 921–24, 527). The ALJ repeatedly cited to these symptoms in evaluating Plaintiff's limitations and the associated medical opinions (Tr. 32–33). Additionally, in May through July of 2013, Dr. Lee noted a worsening of Plaintiff's neck pain and marked spinal tenderness, and by early 2014 he had prescribed a Butrans Patch in order to address this increased, persistent pain (Tr. 919–20, 949). Thus, the ALJ's change in his RFC assessment from light to sedentary work with limitations is substantially supported by the record.

Second, Plaintiff asserts that the ALJ failed to properly apply the pain standard used to evaluate a claimant's subjective complaints. The court notes that Plaintiff presents this argument only in broad, conclusory terms, bereft of any detail.

A claimant may establish that he has a disability through his own testimony regarding his pain or other subjective symptoms. Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam). In such a case, the claimant must show: (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be

reasonably expected to give rise to the alleged pain. *Id.* The ALJ is not required to recite the pain standard word for word, but instead, must make findings that indicate that the standard was applied. *See* Wilson v. Barnhart, 284 F.3d 1219, 1225–26 (11th Cir. 2002) (per curiam) (holding that the ALJ did not err where his findings and discussion indicated that the three-part standard was applied and he cited to 20 C.F.R. § 404.1529; also noting that § 404.1529 "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard.").

If, as here, the ALJ determines under the third prong of the standard that the claimant has a medically determinable impairment that could reasonably be expected to produce the pain, he must then evaluate the extent to which the intensity and persistence of the pain limits the claimant's ability to work. 20 C.F.R. § 404.1529(b). The ALJ may consider the claimant's history, the medical signs and laboratory findings, the claimant's statements, statements by treating and non-treating physicians, and other evidence relating to how the pain affects the claimant's daily activities and ability to work. § 404.1529(c). "While both the Regulations and the Hand [v. Bowen, 793 F.2d 275, 276 (11th Cir. 1986)] standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself." Elam, 921 F.2d at 1215. "[P]ain alone can

be disabling, even when its existence is unsupported by objective evidence." <u>Foote</u> <u>v. Chater</u>, 67 F.3d 1553, 1561 (11th Cir. 1995) (citations omitted). The presence or absence of evidence to support symptoms of the severity claimed, however, is a factor to be considered. <u>Marbury v. Sullivan</u>, 957 F.2d 837, 839–40 (11th Cir. 1992); <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983).

As with Plaintiff's previous ground for relief, the focus here is on the ALJ's pre-2013 finding that Plaintiff had the RFC to perform light work with additional limitations. The ALJ found Plaintiff's impairments could reasonably be expected to cause some of his pain and other symptoms, but he found Plaintiff not to be entirely credible as far as the intensity, persistence, and limiting effects of his symptoms (Tr. 28). Again, in a fashion similar to Plaintiff's first ground for relief, the ALJ noted that the level of severity of symptoms and limitations as alleged by Plaintiff did not comport with the medical evidence in the record. Support for the ALJ's position is again founded on the observation that Plaintiff's examination results and medical impressions from his doctors generally called for a conservative course of treatment (Tr. 28–29). The court finds that the ALJ considered Plaintiff's testimony regarding his pain (Tr. 21), properly evaluated the extent to which Plaintiff's pain intensity and persistence might limit his ability to work, found Plaintiff's testimony inconsistent with the evidence, and adequately sourced his findings in the record. The court also

adds that much of Plaintiff's testimony at the hearing seemed related to his recent (that is, post-2013) medical difficulties, wherein the added limitations caused by his heart problems, plus the overall worsening of his neck condition, had taken effect. It was only in response to a direct question from the ALJ that the Plaintiff commented—very briefly—on his condition as it existed prior to 2013 (Tr. 974).

Last, Plaintiff contends:

> [T]he ALJ's decision is not supported by substantial competent evidence as he failed to rely on a response from the VE's [sic] to a question which comprehensively described all of plaintiff's restrictions. . . . In the instant case, the ALJ relied on a response to a question that was premised on the ALJ's finding that plaintiff was capable of light work with some additional restrictions, e.g., the option to alternate sitting and standing every 30 minutes and the occasional ability to push/pull and reach overhead. However, such minimal limitations are not supported by the record.

(ECF No. 15 at 23).

Plaintiff's argument is in actuality a continuation of his earlier arguments that the ALJ improperly determined that Plaintiff had the RFC to do light work with additional limitations. Naturally, if the RFC determination were in error, then reliance upon the VE's testimony as to jobs available for a person with such an RFC would be unreliable. But the court has not found the ALJ's RFC determination to be in error;

therefore the hypothetical question posed to the VE based on that RFC, to which the VE stated there were ample jobs available in the national economy, was valid.[4]

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); <u>Lewis</u>, 125 F. 3d at 1439; <u>Foote</u>, 67 F.3d at1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED**:

That the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

**DONE AND ORDERED** this <u>29th</u> day of August 2017.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE  JUDGE**

---

[4] In relation to the ALJ's hypothetical based on Plaintiff's pre-2013 RFC, the VE testified that there were available jobs such as a mail clerk, non-postal (DOT 209.687-026, light, unskilled, SVP 2) with 3,250 jobs in the state and 280,000 jobs in the United States; office helper (DOT 239.567-010, light, unskilled, SVP 2) with 2,900 jobs in the state and 220,000 jobs in the United States; and shipping and receiving clerk (DOT 222.387-074, light, unskilled, SVP 2), with 3,100 jobs in the state and 325,000 jobs in the United States (Tr. 35, 981–83).

Case No. 3:16cv194/MCR/EMT

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.** *See* **11th Cir. Rule 3-1; 28 U.S.C. § 636**.